# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAY KRUISE** | ) | |
| | ) | |
| **550 Palmer Circle** | ) | |
| **Dickson City, Pennsylvania 18519** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No.** |
| | ) | |
| **JOHN M. McHUGH,** | ) | |
| **SECRETARY OF THE ARMY** | ) | |
| | ) | |
| **101 Army Pentagon** | ) | |
| **Washington, D.C. 20310-1010** | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF THE ARMY** | ) | |
| | ) | |
| **101 Army Pentagon** | ) | |
| **Washington, D.C. 20310-1010** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| **Serve: United States Attorney for the** | ) | |
| **District of Columbia** | ) | |
| **c/o Civil Process Clerk** | ) | |
| **555 4ᵗʰ Street NW** | ) | |
| **Washington, D.C. 20001** | ) | |
| **and** | ) | |
| **Hon. Loretta E. Lynch** | ) | |
| **Attorney General** | ) | |
| **950 Pennsylvania Avenue, N.W.** | ) | |
| **Room 511** | ) | |
| **Washington, D.C. 20530** | ) | |
| | ) | |
| **Defendants** | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**Plaintiff Jay Kruise** ["Kruise"], by his attorney Paul Victor Jorgensen, sues John M. McHugh, Secretary of the Army, in Secretary McHugh's official capacity, and the United States Department of the Army [the "Agency"], an agency of the United States of America, and demands a jury trial:

### Preliminary Statement

1)   This is a civil action for damages, injunctive, and declaratory relief, along with attorney fees and costs of litigation, arising from the Agency's breaches of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 701 *et seq*.), specifically Section 501 (29 U.S.C. § 791); the Americans with Disabilities Act of 1990, as amended (42 U.S.C. §§ 12101 *et seq*.); Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq*.), specifically Section 717 (42 U.S.C. § 2000e-16); the Back Pay Act of 1966, 5 U.S.C. § 5596; and the rules, regulations, and public directives under such legislation, including Title 29 of the Code of Federal Regulations, Parts 1614 and 1630. These breaches occurred when employees of the Agency intentionally misused Kruise's mental health disability to suspend him from the Agency without pay for almost eight months in a foreign country to retaliate against him for a prior EEOC complaint that he had filed.

## Jurisdictional Statement

2) This Court has jurisdiction under the legislation and regulations recited above, including the remedies and enforcement provisions contained in 29 U.S.C. § 794a, 42 U.S.C. § 12117, 42 U.S.C. §§ 2000e-5 and 2000e-16(c), and 29 CFR §§ 1614.310 and 1614.407. Plaintiff Kruise filed the equal employment opportunity (EEO) administrative complaint underlying this lawsuit with Defendant United States Department of the Army (the "Agency") on or about April 30, 2007.

3) On July 24, 2008, the Agency issued an action to adopt a decision of an Equal Employment Opportunity Commission (EEOC) administrative judge that recommended dismissal of Kruise's EEO complaint based on procedural grounds urged by the Agency. Kruise timely appealed the Agency's July 24, 2008 action to the EEOC Office of Federal Operations ["OFO"].

4) On April 6, 2011, EEOC OFO reversed the Agency's July 24, 2008 action, and remanded the proceeding for a substantive adjudication.

5) No final Agency order exists, and it has been far more than one hundred and eighty (180) days since Plaintiff Kruise filed his EEO complaint. This Court has jurisdiction under the authorities recited in Paragraph 2.

6) Venue is appropriate in the District of Columbia pursuant to 28 U.S.C. 1391(e).

## Parties

7) Plaintiff Jay Kruise's permanent address is 550 Palmer Circle, Dickson City, Pennsylvania 18519. Plaintiff Kruise ["Kruise"] was born in Laos, immigrated to the United States at age ten, and is Asian in race, national origin, appearance, and color. After graduating from high school, Kruise continuously and loyally served the United States military, both in the service and as a civilian.

8) Defendant United States Department of the Army [the "Agency"], Army Pentagon, Washington, D.C. 20310-1010, is an agency of the Defendant United States of America. The Agency's administrative offices are located at the Pentagon as part of the District of Columbia. The Agency employed Kruise as an Information Technology Specialist, GS-2210-11, at the 405th Army Field Support Brigade in Seckenhelm, Germany until it suspended his employment on November 21, 2006, using his mental health disability as a pretext. After Kruise was cleared by an Agency psychiatrist, the Agency returned him to duty eight months later, but forced him to transfer to the Tobyhanna Army Depot in Tobyhanna, Pennsylvania at a lower grade level.

9) Defendant John M. McHugh is the head of the Agency and is sued in his official capacity. Secretary McHugh's official office is located at 101 Army Pentagon, Washington, D.C. 20310-1010. Secretary McHugh's official Agency residence is within the District of Columbia.

## Facts

10)  Kruise was born in 1970 to an impoverished family in Laos; he was the oldest of four children. His family escaped to Thailand when he was eight years old, and Kruise at ten immigrated to the United States.

11) After graduating from high school in 1989, Kruise enlisted in the United States Navy. Following technical training, he reported to San Diego for fleet readiness training. Kruise served three years with an anti-submarine squadron in San Diego, and deployed to the Persian Gulf during Operations Desert Shield, Desert Storm, and Deny Flight.  After almost six years of loyal and productive service, the Navy discharged Kruise under honorable conditions.

12) After he left the Navy, Kruise attended North Seattle Community College, and graduated in 1999 with an Associate of Applied Science degree in computer network technology.

13) While he was still in college, employees of the Veterans Administration diagnosed and treated Kruise for depression and other mental illnesses related to his military duty to the United States.

14) The United States Air Force employed Kruise as a temporary computer assistant in Youngstown, Ohio from August 1999 to March 2000.  In March 2000, the Agency employed Kruise as a computer assistant in Heidelberg, Germany. Kruise frequently traveled to Fort Steward, Georgia to train soldiers in computer

software to track troop movements in the Balkans. He received cash awards and excellent performance appraisals. After ten months, the Agency employed him in a permanent computer specialist position with the 8th Finance Battalion in Baumholder, Germany.

15) In 2003, the Agency reassigned Kruise to Tobyhanna Army Depot in Pennsylvania. Kruise experienced acts of racial discrimination almost daily. He was one of only two Asian-Americans out of approximately 3,000 civilian employees at the Depot, and the other was an elderly female working as a janitor.

16) In April 2004, Kruise reported to Eygelshoven, Holland to work for the Agency as an IT Specialist. In 2005, the Agency reassigned him to the 405th Army Field Support Brigade Europe, Seckenheim, Germany to work as a computer help desk technician. During both assignments, Kruise encountered acts of racial discrimination from his supervisors and others.

17) In part due to the racial discrimination that he experienced at the Agency, Kruise became clinically depressed, suffered other mental health impairments, and sought treatment from the Veterans Administration. He requested accommodation for his impairments from the Agency without success.

18) On May 2, 2006 Kruise filed a complaint in the Agency's EEO office, reporting that his supervisor Eleanor Hendricks had discriminated against him

based on his race, national origin, and reprisal for participation in a protected EEO activity.

19) On July 26, 2006, while Kruise's EEO complaint against Hendricks was pending, Kruise e mailed Hendricks that he could not concentrate due to "continuing harassments that I get from you, the EEO complaint, my future employment, medical treatment at Landstulth Regional Medical Center and the medical condition that I have as the result(.)"

20) On July 28, 2006, Agency supervisory officials met with Kruise in response to his e mail to Hendricks. Kruise explained that he was under psychiatric care, and that his interactions with Hendricks had caused him stress that had aggravated this condition. The Agency officials promised that they would "look at arranging some type of accommodations to assist him" if he submitted "a diagnosis and recommendation from his doctor."

21) On September 4, 2006, Kruise's psychologist, Dr. Glenn Koppel, provided the Agency with a written diagnosis that Kruise suffered from depression partially due to and aggravated by his work situation, and recommended that the Agency transfer him to a work location where he can "apply and further develop his skills without the feeling of being held back, harassed and demoralized."

22)  Kruise e mailed Dr. Koppel's evaluation to the Agency officials that he had met. He explained that "I am suffering from severe form of major depressive disorder" and requested a transfer as an accommodation for his disorder.

### Supervisory Officials of the Agency Intentionally Misuse False Information to Cause Kruise's Suspensions Based on His Disorder

23)  Agency officials familiar with Kruise's EEO complaint against Hendricks met with Hendricks. Hendricks and these Agency officials decided that the Agency would misuse his mental health disorder as a "loophole" to suspend or remove him without following normal due process and legal procedures.

24) Darrell Bright had just become Regional Chief Information Officer in Europe for the Agency. As part of the decision by Hendricks and other Agency officials to misuse Kruise's mental health disorder as a loophole to suspend or remove him, Hendricks knowingly and intentionally supplied Bright with false information to show that Kruise was a security risk. Hendricks or some other Agency official or officials also provided Bright with the September 4, 2006 evaluation by Dr. Koppel even though federal regulations  (29 C.F.R. § 1630.14) required this evaluation to be maintained as a confidential medical record. Using this information, on September 12, 2006, Bright wrote a letter to Kruise's commanding officer, Colonel Pinkston, who had only recently assumed his command, that demanded in the form of a "recommendation" that Kruise's security clearance be suspended immediately.

25) As part of his September 12, 2006 letter to Colonel Pinkston, Bright knowingly and falsely made numerous material misrepresentations, including the following: that Bright had been the "deciding official" for the complaint filed by Kruise against Hendricks; that he had reviewed the facts and "found no conclusive evidence that would enable me to make a decision in favor of Mr. Kruise"; that he had reviewed "several hundred e mail messages" presented by Hendricks; and that he had discovered numerous e mails "pertaining to Mr. Kruise that caused me grave concern regarding his stability and judgment."

26) Contrary to his September 12, 2006 letter to Colonel Pinkston, Bright was never the "deciding official" for the complaint filed by Kruise against Hendricks; Bright had no involvement with or decision-making in that proceeding; Bright had never met Kruise; Bright had no knowledge of Kruise's case against Hendricks or the facts underlying it; Bright had never reviewed any e mails except a few, if any, that had been provided by Hendricks; and Bright did not have any basis for "grave concern." Bright's September 12, 2006 letter to Colonel Pinkston deliberately misquoted parts of Dr. Koppel's evaluation so that it falsely appeared that Dr. Koppel had found that Kruise's depression was caused solely by his "work situation," omitted Dr. Koppel's other findings, and omitted Dr. Koppel's recommendations for accommodation by the Agency. Based on his intentional lies, Bright "recommended" the suspension of Kruise's security clearance.

27) On September 14, 2006, Colonel Pinkston suspended Kruise's access to classified information in reliance on the numerous intentional and material falsehoods in Bright's letter. On September 18, 2006, Agency official Lane, one of the Agency officials who had earlier met with Kruise regarding his request for accommodation, issued a proposal to suspend Kruise's employment without pay "until the US Army Central Personnel Security Clearance Facility (CCF), makes a final determination regarding the temporary revocation of your security clearance."

28) By letter to Colonel Pinkston dated September 25, 2006, Dr. Koppel supplemented his September 4th evaluation to state that Kruise's condition did not pose any security risk, and that he had the mental capacity to perform his job.

29) On September 28, 2006, Kruise replied to the Agency's proposal to suspend his access to classified information and his employment, stating in writing that: "I am fit for duty and not a threat to national security." He requested a transfer back to Tobyhanna Army Depot, Pennsylvania, and a temporary assignment to work at home or another duty location pending such transfer.

30) On November 21, 2006, Colonel Pinkston issued a notice of decision that upheld the suspension of Kruise's employment. It incorrectly instructed Kruise that he had a right to appeal "this action to the Merit Systems Protection Board (MSPB)." Five days later, the Agency placed Kruise on indefinite suspension without pay. The Agency then hired a contractor to replace Kruise.

31) Per Colonel Pinkston's instructions, Kruise filed an appeal to the Merit Systems Protection Board ("MSPB").

### *Kruise Seeks Redress Before EEOC*

32) On January 22, 2007, Kruise filed an EEO complaint, alleging that the Agency had discriminated against him based on his disability, and in reprisal for his prior EEO activity, when Colonel Pinkston suspended his security clearance and employment, upheld his decision, failed to provide Kruise with reasonable accommodation, and suspended his access to classified and sensitive information without the opinion of a competent medical authority that he posed a security risk.

33) On January 29, 2007, the Agency issued a "final decision" on Kruise's January 22, 2007 EEO complaint that dismissed it without considering its substance, because he had asserted the same matters in his pending MSPB appeal.

34) On February 22, 2007, Kruise appealed the January 29, 2007 decision of dismissal to the EEOC Office of Federal Operations ["OFO"].

35) On February 26, 2007, an MSPB judge affirmed the suspension of Kruise's employment, but did not consider his underlying discrimination defenses based on the judge's determination that the MSPB lacked jurisdiction.

36) On April 13, 2007, the Agency, through its EEO office, notified Kruise that it had received the MSPB decision, that there "may be some question as to whether the MSPB had jurisdiction over the EEO element of your mixed-case

appeal," and that he had 45 days to contact an EEO officer of the Agency, and file another complaint. On April 27, 2007, the Agency provided Kruise with a notice of his right to file such a complaint within 15 days.

37) On or about April 30, 2007, Kruise filed the EEO complaint that underlies this lawsuit. Kruise alleged that he was discriminated against due to the Agency's failure to provide reasonable accommodation for his disability, reprisal for his EEO complaint against Hendricks, and when Colonel Pinkston failed to obtain the opinion of a medical authority before suspending him.

38) On May 3, 2007, the Agency issued a "final decision" to accept Kruise's April 30, 2007 EEO complaint. This decision acknowledged that these claims had been previously dismissed by the MSPB, but explained that the Agency had invited Kruise to refile them because the MSPB failed to "clearly declare the jurisdiction of the EEO elements of your mixed case appeal." The Agency later amended its decision to accept additional claims of discrimination made by Kruise based on events that occurred after he had filed his April 30, 2007 complaint.

### The Agency Determines that Kruise Is Not a Security Risk

39) On or about July 9, 2007, Agency psychiatrist Robert Henley conducted an extensive mental health evaluation of Kruise that confirmed that Kruise posed no security risk. Dr. Henley concluded, in part:

> Mr. Kruise's intellectual and moral grounding are solid, his training and experience commensurate with his pay grade – but he has

historically adapted poorly to situations involving regular supervisor-subordinate contact.   His ideal job would maximize his technical expertise while limiting his direct face-to-face interactions with others.  This is entirely feasible in his field of Information Technology where work can be conducted remotely.

With regard to his security clearance, there is nothing about Mr. Kruise's condition that calls into question his reliability or trustworthiness in handling sensitive information.   On this front he can be expected to exhibit nothing short of sound judgment and good moral reasoning.

40) As a result of Dr. Henley's evaluation, the Agency Central Personnel Security Clearance Facility ("CCF") ordered the restoration of Kruise's security clearance. On July 31, 2007, the Agency returned Kruise to duty, temporarily assigning him to the Supply Division, 405 AFSB.  On September 16, 2007, the Agency reassigned him to Tobyhanna Army Depot, Tobyhanna, Pennsylvania, but at a lower grade and pay scale.

41) On August 16, 2007, the EEOC Office of Federal Operations issued a decision that affirmed the Agency's dismissal of his January 22, 2007 EEO complaint. The EEO complaint that Kruise had filed on or about April 30, 2007, referenced in Paragraphs 37 and 38, remained pending.

### The Agency's Investigation Pursuant to 29 CFR § 1614.108

42) On November 6, 2007, the Agency issued its Report of Investigation ["ROI"] and Investigative File ["IF"] pursuant to 29 C.F.R. § 1614.108 on Kruise's April 30, 2007 EEO complaint.  The Agency investigator listed the claims asserted

by the complaint and Kruise's amendments, and examined them in connection with the failure to accommodate, disparate treatment, and retaliation "theories of discrimination." The Agency investigator made numerous findings that supported Kruise's complaint.

43) First, as to the failure to accommodate theory, the Agency investigator found that the Agency considered that Kruise had an impairment that substantially limited his major life activity of working, and suspended his access to classified information an employment positions requiring a security position based on this perception. The investigator also found Kruise to be "a qualified individual with a disability." The Agency's offers of reassignments before his suspension and following his disclosures regarding his mental health supported this finding.

44) The Agency investigator found that Agency officials met with Kruise and advised him to provide documentation from his physician how to accommodate him. In response, Kruise submitted the two letters from Dr. Koppel.

45) The Agency investigator concluded that:

> It is presumed that the agency temporarily reassigned Complainant in July 2007 as a result of a medical evaluation conducted by an agency physician, which concluded that Complainant did not pose a security risk. *The agency did not proffer any explanations for the length of time required to conduct the evaluation.* (Complainant was suspended on November 26, 2006, and the evaluation was issued on July 9, 2007) [*Emphasis added.*]

46) Second, the Agency investigator analyzed Kruise's claims under the disparate treatment theory of discrimination. As to these claims, the Agency investigator found that Kruise is a member of a protected group by virtue of his disability; that he contended that he was treated differently from a co-worker, Mark Dillingham, because Dillingham had a mental disability (post-traumatic stress disorder) but was not suspended; that Colonel Pinkston did not suspend any other employees during the period at issue; that Kruise was suspended on November 26, 2006, but that the Agency physician did not issue a medical opinion until July 9, 2007; and that the record lacked any evidence that the Agency attempted to obtain a medical opinion during the suspension.

47) Third, the Agency investigator analyzed the record based on the retaliation theory of discrimination. She found, *inter alia*, that Darrell Bright, the self-proclaimed "deciding official" in Kruise's EEO complaint against Hendricks, testified that he was unaware of Kruise's prior EEO activity; that other officials who met with Kruise knew of Kruise's prior EEO activity; that Kruise was subject to an adverse employment action when he was indefinitely suspended; and that co-worker Mark Dillingham testified that he was threatened by Hendricks when Dillingham was scheduled to participate in Kruise's EEO proceeding.

### The EEOC OFO Adjudication and Remand

48) The Agency moved without hearing before the administrative judge assigned to the case, contending that the Agency had already dismissed Kruise's claims in its January 29, 2007 "final decision." The administrative judge granted the Agency's motions, the Agency issued a "final decision" to implement this decision, and Kruise timely appealed this "final decision" to the EEOC Office of Federal Operations ["OFO"].

49) On April 6, 2011, OFO issued a decision on Kruise's timely appeal, resulting in a reversal and remand under 29 CFR § 1614.109. OFO vacated the Agency's "final decision," and remanded "the entire complaint for an adjudication on the merits of all the issues," listed as issues 1 through 8. *Kruise v. Dept. of Army*, OFO Appeal No. 0120083702, p 5 (April 6, 2011).[1]

50) On remand, EEOC reassigned this proceeding to a different administrative judge. On July 9, 2012, the Agency submitted a new motion, arguing that administrative judge should grant it a decision without a hearing on all of Kruise's claims in his April 30, 2007 EEO complaint and amendments to it. Kruise submitted an opposition and counter-motion. The case was again reassigned to a different administrative judge, and on March 31, 2015, the administrative judge issued an order denying all dispositive motions. Neither the administrative

---

[1] Kruise withdrew claim h, referred to as issue 8, prior to the OFO decision.

judge nor the Agency have completed the administrative adjudication of Kruise's complaint and no final Agency order exists.  It has been far more than one hundred and eighty days since Plaintiff Kruise filed his April 30, 2007 complaint.

### Count One: Defendants Unlawfully Discriminated Against Kruise Based on His Disability, or Perception of His Disability, by Refusing to Provide Him With Reasonable Accommodation

51) The averments contained in Paragraphs 1 through 50, 73 through 85, and 89 through 90 of this Complaint are realleged and incorporated into this Count.

52) Kruise is and was at the time that the Agency suspended his employment and at all other pertinent times a disabled person because he has and had a mental impairment that substantially limits one or more of his major life activities, including working.

53) Kruise is and was at the time that the Agency suspended his employment and at all pertinent times a disabled person because he has and had a record of such a mental impairment, and because he was and is regarded by Defendants as having such a mental impairment.

54) Kruise is and was at all pertinent times a qualified individual with a disability because he can and did have the capacity to perform the essential functions of his position with reasonable accommodation, without endangering the health or safety of Kruise or any other individuals.

55) The Agency suspended Kruise's security clearance and employment based on his mental impairment, his record of such a mental impairment, and because he was considered by the Agency as having such a mental impairment.

56) Prior to the Agency's suspension of his employment, Kruise requested that the Agency provide him with reasonable accommodations, including a transfer back to Tobyhanna Army Depot, a temporary assignment to work at home, or a temporary assignment to another duty location away from Hendricks and another employee who had provided evidence against him. None of these accommodations would have imposed an undue burden on Defendants' operations.

57) The Agency, by and through Kruise's supervisory employees, knowingly and intentionally denied Kruise's requests for reasonable accommodations.

58) The Agency's justification for its concerns regarding Kruise's purported risk to security was pretextual and knowingly false. As set forth in Paragraphs 24-31, Bright and other Agency officials chose to report information that they knew to be false in order to retaliate against Kruise for his earlier EEO complaint, and to use his disorder as a pretext to cause the suspension of his security clearance and employment.

59) The Agency willfully disregarded the evidence submitted by Kruise that he could perform his duties with reasonable accommodation, that he posed no risk

to the Agency, and misused such evidence to distort it as part of the false information that it relied on for Kruise's suspension.

60) In spite of ample opportunity, the Agency never consulted any medical authority prior to its suspensions of Kruise, and not until July 7, 2007, when Agency psychiatrist Robert Henley reported from his extensive evaluation that Kruise was capable and posed no security risk.

61) The Agency's actions in this case were counter to the national security interest. By punishing Kruise for voluntarily seeking help for a mental health disorder, the Agency sent a resounding message to Kruise and thousands of other loyal federal employees with similar disorders to keep such illnesses as quiet as possible, and to avoid seeking assistance from either the Agency or private professionals such as Dr. Koppel. By refusing to be a "model employer" for employees with disabilities such as Kruise, as required by federal law (29 C.F.R. § 1614.203(a)), the Agency shut down its capacity to take proactive measures to help such employees, and to prevent them from spiraling downwards into negative, unproductive, and potentially dangerous situations.

62) As a direct and proximate result of Defendants' conduct, Kruise has suffered mental anguish, emotional distress, loss of his livelihood, lost wages and benefits, injury to his reputation among co-workers and at his places of employment, humiliation and embarrassment, impoverishment and hardship,

reduction in pay grade, loss of promotions, extensive legal fees, and other kinds of injuries.

**WHEREFORE**, Kruise requests judgment and relief against the Defendants as follows:

A. Judgments and relief in favor of Kruise and against Defendants for injuries suffered as a result of Defendants' wrongful and unlawful acts, and any interest therein.

B. Order a return to the pay grade and promotions for which Kruise would have been entitled absent Defendants' wrongful and unlawful acts.

C. Award of all reasonable attorney's fees and costs of litigation, both in the administrative proceedings and in this action, pursuant to 29 U.S.C. § 794a and Section 706(k) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-5(k)).

D. Such other and further relief as may be deemed just and equitable.

### Count Two: Defendants Unlawfully Discriminated Against Kruise Based on His Disability, or Perception Of His Disability, by Their Disparate Treatment of Him

63) The averments contained in Paragraphs 1 through 62, 73 through 85, and 89 through 90 of this Complaint are realleged and incorporated into this Count.

64) Kruise was treated substantially more adversely in his employment than at least one other similarly situated employee, co-worker Mark Dillingham, who also had a mental disability but was not similarly suspended.

65) The Agency did not suspend any non-mentally disabled employees similarly situated during the period at issue.

66) As a direct and proximate result of Defendants' conduct, Kruise has suffered mental anguish, emotional distress, loss of his livelihood, lost wages and benefits, injury to his reputation among co-workers and at his places of employment, humiliation and embarrassment, impoverishment and hardship, reduction in pay grade, loss of promotions, extensive legal fees, and other kinds of injuries.

**WHEREFORE**, Kruise requests judgment and relief against Defendants as follows:

A. Judgments and relief in favor of Kruise and against Defendants for injuries suffered as a result of Defendants' wrongful and unlawful acts, and any interest therein.

B.  Order a return to the pay grade and promotions for which Kruise would have been entitled absent Defendants' wrongful and unlawful acts.

C. Award of all reasonable attorney's fees and costs of litigation, both in the administrative proceedings and in this action, pursuant to 29 U.S.C. § 794a and Section 706(k) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-5(k)).

D. Such other and further relief as may be deemed just and equitable.

## Count Three: Defendants Unlawfully Discriminated Against Kruise Based on Retaliation for His Prior EEO Complaint

67) The averments contained in Paragraphs 1 through 66, 73 through 85, and 89 through 90 of this Complaint are hereby realleged and incorporated into this Count.

68) As set forth in Paragraphs 21-31, Agency officials knowingly and deliberately falsified information to retaliate against Kruise for his prior EEO activity.

69) The Agency investigator found based on undisputed evidence that Agency official Bright had testified he was unaware of Kruise's prior EEO activity when he issued his September 12, 2006 letter to Colonel Pinkston; (testimony contrary to the deliberate misrepresentations in Bright's September 12, 2006 letter as described in Paragraphs 26 and 27); that other Agency officials who met with Kruise knew of Kruise's prior EEO activity; that Kruise was subject to an adverse employment action when he was indefinitely suspended; and that co-worker Dillingham testified that he was threatened by Hendricks when Dillingham was scheduled to participate in Kruise's EEO complaint.   All of these findings are true, unrebutted, and supported by the evidence.

70) The undisputed evidentiary record shows that the Agency actions against Kruise were undertaken based on voluntary disclosures by Kruise and psychologist Koppel concerning Kruise's disorder. In considering this evidence, the Agency

decided not to consider the unrebutted medical record that Kruise did not pose any risk to security, judgment, or ability to perform his job, but elected to interpose the judgment of its lay employees who manufactured a "loophole" to get rid of Kruise for his EEO activities using his disability.

71) As a direct and proximate result of Defendants' conduct, Kruise has suffered mental anguish, emotional distress, loss of his livelihood, lost wages and benefits, injury to his reputation among co-workers and at his places of employment, humiliation and embarrassment, impoverishment and hardship, reduction in pay grade, loss of promotions, extensive legal fees, and other kinds of injuries.

**WHEREFORE**, Kruise requests judgment and relief against Defendants as follows:

A. Judgments and relief in favor of Kruise and against Defendants for injuries suffered as a result of Defendants' wrongful and unlawful acts, and any interest therein.

B. Order a return to the pay grade and promotions for which Kruise would have been entitled absent Defendant's wrongful and unlawful acts.

C. Award of all reasonable attorney's fees and costs of litigation, both in the administrative proceedings and in this action, pursuant to 29 U.S.C. § 794a and Section 706(k) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-5(k)).

D. Such other and further relief as may be deemed just and equitable.

## Count Four: Defendants Breached Laws Governing
## Kruise's Security Access, and His Rights to Due Process

72) The averments contained in Paragraphs 1 through 71 of this Complaint are realleged, and incorporated into this Count.

73) This Court also has jurisdiction over this count pursuant to the United States Constitution and 28 U.S.C. § 1331.

74) At all pertinent times, Executive Order 12968 of August 2, 1995 § 3.1(c) forbid Defendants from discriminating on the basis of race, color, religion, sex, national origin, disability, or sexual orientation in granting Kruise access to classified information.

75) At all pertinent times, 32 C.F.R. §§ 154.56(b) and 155.4(c) provided that no "unfavorable administrative action," defined to include both an unfavorable personnel security determination and an adverse action taken as a result of a personnel security determination, may be undertaken unless the employee has been afforded procedural benefits that include, *inter alia* (1) a written statement of reasons for the unfavorable administrative action, signed by an adjudicatory official within CCF; (2) an opportunity to respond in writing; (3) a right to a hearing [in certain cases]; (4) a written response, stating the final reasons; and (5) an opportunity to appeal to a higher level authority.

76) At all pertinent times,  Paragraph 27 to Appendix I of Part 154 Title 32 of the Code of Federal Regulations required that a duly qualified mental health professional such as a clinical psychologist or psychiatrist employed by or acceptable and approved by the United States should be consulted when evaluating potentially disqualifying and mitigating information concerning the psychological conditions of an employee. Paragraph 29 of this provision further required the Defendants to consider as mitigation that the identified psychological condition is readily controlled with treatment; that the employee has demonstrated ongoing compliance with such treatment; that the prognosis is favorable; and the opinion by a duly qualified professional that the condition is under control or in remission or has a low probability of recurrence or exacerbation.

77) At all pertinent times, Section 2-200(j) of Department of Army Regulation 380-67 required the Agency to obtain the opinion of competent medical authority in applying the security standards applicable to Kruise.  At all pertinent times, Section 8-102b.(2) of Department of Army Regulation 380-67 required Colonel Pinkston to consider Dr. Koppel's evaluation, including his September 25, 2006 letter to Colonel Pinkston attached and incorporated as Exhibit D, to determine whether to suspend Kruise or reinstate his security clearance. At all pertinent times, Sections 8-200 and 8-201 of Department of Army Regulation 380-67 prohibited Defendants from undertaking the unfavorable administrative action

against Kruise specified in Paragraphs 21-31 of this Complaint without providing him with a written statement of why the action was being undertaken that was as comprehensive and detailed as protection of sources under the Privacy Act and national security permit, and complied with the procedural requirements in the Federal Personnel Manual before issuing a statement of reasons for its suspension action.  These sections incorporated other procedural protections that Defendants failed to follow, including 32 C.F.R. §§ 154.56(b) and 155.4(c).

78) The Agency's actions were undertaken by the Agency in breach of the procedures and laws identified in Paragraphs 74-77.

79) Contrary to Executive Order 12968 of August 2, 1995 § 3.1(c), Defendants discriminated against Kruise in his access to classified information on the basis of his race, color, national origin, and disability.

80) Contrary to 32 C.F.R. §§ 154.56(b) and 155.4(c), the Agency undertook an unfavorable administrative action or actions against Kruise, specifically an adverse personnel security determination as described in the preceding Paragraphs 24 through 31, without providing Kruise with the procedural protections required by those provisions, including those in the Paragraph 75.

81) Contrary to Paragraph 27 to Appendix I of Part 154 Title 32 of the Code of Federal Regulations, the Agency failed to consult a duly qualified mental health professional such as a clinical psychologist or psychiatrist when it was evaluating

potentially disqualifying and mitigating information concerning Kruise's conditions, including when it undertook the actions described in Paragraphs 24 through 31.

82) Contrary to Paragraph 29 to Appendix I of Part 154 Title 32 of the Code of Federal Regulations, the Agency failed to consider as mitigation the complete evaluation of Dr. Koppel, consisting of the letters attached and incorporated as Exhibits C and D, when it undertook the actions described in Paragraphs 24 through 31.

83) Contrary to Section 2-200(j) of Department of Army Regulation 380-67, the Agency failed to obtain the opinion of competent medical authority in applying the security standards applicable to Kruise when it undertook the actions described in Paragraphs 24 through 31.

84) Contrary to Section 8-102b.(2) of Department of Army Regulation 380-67, the Agency failed to consider Dr. Koppel's complete evaluation, including his September 25, 2006 letter to Colonel Pinkston, when it undertook the actions described in Paragraphs 24 through 31.

85) Contrary to Sections 8-200 and 8-201 of Department of Army Regulation 380-67, the Agency undertook an unfavorable administrative action or actions against Kruise, specifically an adverse personnel security determination as described in the preceding Paragraphs 24 through 31, without providing Kruise

with the procedural protections required by those provisions, including those in Paragraph 77.

86) The Agency's actions denied Kruise due process of law as guaranteed by the Fifth Amendment of the United States Constitution.

87) As a direct and proximate result of Defendants' conduct, Kruise has suffered mental anguish, emotional distress, loss of his livelihood, lost wages and benefits, injury to his reputation among co-workers and at his places of employment, humiliation and embarrassment, impoverishment and hardship, reduction in pay grade, loss of promotions, extensive legal fees, and other kinds of injuries.

**WHEREFORE**, Kruise requests judgment and relief against Defendants as follows:

A. Judgments and relief in favor of Kruise and against Defendants for injuries suffered as a result of Defendants' wrongful and unlawful acts, and any interest therein.

B. Order a return to the pay grade and promotions for which Kruise would have been entitled absent Defendant's wrongful and unlawful acts.

C. Award of all reasonable attorney's fees and costs of litigation, both in the administrative proceedings and in this action.

D. Such other and further relief as may be deemed just and equitable.

## Count Five: Defendants' Unlawfully Failed to
## Compensate Plaintiff Under the Back Pay Act

88) The averments contained in Paragraphs 1 through 87 of this Complaint are realleged, and incorporated into this Count.

89) Defendants' actions under Paragraphs 24 through 31 were an unjustified or unwarranted personnel action against Kruise that resulted in the withdrawal or reduction of all or part of his pay, allowances, or differentials.

90) Agency psychiatrist Robert Henley's evaluation, and CCF's resulting order to the Agency to restore Kruise's security clearance, was an administrative determination that Defendant's actions under Paragraphs 24 through 31 were an unjustified or unwarranted personnel action.

91) Contrary to the requirements of 5 U.S.C. § 5596, the Back Pay Act of 1966, Defendants have refused or failed to provide Kruise with the amount equal to all or any part of the pay, allowances, or differentials, as applicable which he normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by him through other employment during that period.

**WHEREFORE**, Kruise requests judgment and relief against Defendants as follows:

A. Judgments and relief in favor of Kruise and against Defendants for all lost pay, allowances, and differentials, and all interest accrued since then.

B.  Order a return to the pay grade and promotions for which Kruise would have been entitled absent Defendant's wrongful and unlawful acts.

C. Award of all reasonable attorney's fees and costs of litigation, both in the administrative proceedings and in this action.

D. Such other and further relief as may be deemed just and equitable.

Respectfully Submitted,

_____/s/_____

Paul Victor Jorgensen, Esq.
Trial Bar No. 01183
215 West Main Street, P.O. Box 850
Middletown, Maryland 21769
(301) 293-6822
(301) 371-5840 (FAX)
pauljorgensen@mac.com

Attorney for Jay Kruise

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Respectfully Submitted,

_____/s/_____

Paul Victor Jorgensen, Esq.
Trial Bar No. 01183
215 West Main Street, P.O. Box 850
Middletown, Maryland 21769
(301) 293-6822
(301) 371-5840 (FAX)
pauljorgensen@mac.com

Attorney for Jay Kruise